Jack SCANLON, Plaintiff,

v.

UNITED STATES of America,
Defendant,

v.

W. F. THORNTON and Frances Thornton,
Third-Party Defendants.

Civ. A. No. 31171.

United States District Court,
E. D. Michigan, S. D.

May 14, 1971.

Charles H. Nida, of Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for plaintiff.

John T. Hausner, Asst. U. S. Atty., Daniel P. Mullarkey, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

Kenneth . Kramer, of McDonell, Kramer & McDonald, P. C., Mount Clemens, Mich., for third-party defendants.

## OPINION OF THE COURT, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENNEDY, District Judge.

Plaintiff Jack Scanlon asks for a refund of income tax withholdings, Federal insurance contributions taxes and Federal excise taxes assessed against him and paid by his employer Abner Wolfe, Inc.

■ On May 7, 1971, the Government filed a Motion to Dismiss on the basis that Jack Scanlon, the taxpayer suing for the refund, had paid no taxes and that he was not repaid in interest. This motion was argued at the outset of the trial and taken under advisement by the Court. It is now granted.

Plaintiff's own testimony was that he personally was unaware of the assessment against him, unaware of the payment of the tax and, indeed, unaware that the present action had been brought to seek a refund until at or about the date of trial. He did testify that he signed Exhibit 15, an agreement between himself and Abner Wolfe, Inc. dated May 1967, in which it is recited that Abner Wolfe, Inc. will pay the taxes involved in this refund action, which the District Director of the Internal Revenue Service asserts are due from Mr. Scanlon, and will assist and cooperate in Abner Wolfe, Inc.'s efforts to get a refund of the same. The agreement was mailed to him when he was in Chicago and signed there. The signing of that agreement was the extent of his knowledge or involvement in the payment of these taxes. Mr. Scanlon's answers to interrogatories admit that Abner Wolfe, Inc. actually paid the tax by its check.

■■ The Internal Revenue Code requires that a claim for refund must be filed by a "taxpayer" which in turn is defined as "a person subject to the tax;" Sections 6511 and 7701(a) (14), Internal Revenue Code of 1954. Section 6402(a) of the Code provides that the only person who can be paid a refund of an overpayment, if one is found to have been made, is the person who made the payment. The language of Section 6402(a) is specific in limiting the refund of overpayments to the "person who made the overpayment." Since Section 1346(a) (1), under which this action is brought, requires that a claim for refund must be made before suit can be brought, the provisions of Section 6402(a) limiting the persons to whom refunds can be made, likewise limit the persons who may sue. The mere fact that the funds came from Abner Wolfe,

Inc. would not, in the Court's opinion, bar Jack Scanlon from claiming the refund if Mr. Scanlon had to borrow them or if in any other manner he had obligated himself for their repayment or if he had in fact, using the funds, himself paid the tax. Exhibit 15, however, expressly recites that Abner Wolfe, Inc. assumes the liability for the tax and all of the evidence in the case indicates that it paid it. Both the agreement and Mr. Scanlon's testimony cause the Court to conclude that Mr. Scanlon did not pay the tax.

■ Plaintiff objects to the motion to dismiss because of its late filing. Plaintiff appears however to have had adequate notice. Interrogatories were asked in February of 1971 by the Government seeking the information as to the manner of payment. These were objected to and were answered only after the order of the Court on April 30, 1971. The motion was made promptly thereafter. The information which is the basis for the Government's motion was at all times known to plaintiff. Plaintiff has had a reasonable opportunity to meet this issue and has not shown he was prejudiced in any way by the Government's delay in raising it.

The narrow legal issue raised by the Government's motion to dismiss is one on which neither counsel submitted direct authority and on which the Court was unable to find direct authority. Should the Court be in error in its ruling on this motion it nonetheless concludes for other reasons that the plaintiff is not entitled to a refund.

■ The Government contends that plaintiff Jack Scanlon was an employer within the meaning of Section 3401(d) (1) since he was the person "having control of the payment of such wages." The circumstances in this case are, in the Court's experience, unique.

Plaintiff Scanlon had extensive experience in the retail grocery field. Prior to and during 1964, he was employed by Abner Wolfe, Inc., a distributor of wholesale groceries, as a trouble shooter. In April of 1964, he was assigned certain duties at the store on Mack Avenue in St. Clair Shores, Michigan, which was being operated as "Bucky's Shores Market." A Michigan corporation, known as "Rolly's Shores Market, Inc." most all of the stock of which was owned by one Rolland Thornton, had operated this market until March of 1964. Walker Thornton whose nickname was "Bucky" and who usually went by the name of "Bucky" Thornton was employed at another market owned by Rolland Thornton. The store on Mack Avenue was not profitable. Rolland Thornton, through his various stores (four in number, including the Mack Avenue store) owed Abner Wolfe, Inc. well over $100,000 for groceries and operating monies loaned or advanced to him and his concerns.

In March of 1964 Walker "Bucky" Thornton purchased all of the corporate stock of Rolly's Shores Market, Inc. and he and his wife, Frances Thornton, assumed all of the corporate offices. This purchase was accomplished in the following fashion: Abner Wolfe, Inc. gave Rolland Thornton credit in the amount of $40,000 on the obligations that he and his concerns owed Abner Wolfe, Inc.; Rolly's Shores Market, Inc. signed a note to Abner Wolfe, Inc. for $40,000. This latter sum was greater than the obligations of Rolly's Shores Market, Inc. to Abner Wolfe, Inc. immediately prior to the purchase. The $40,000 was to be repaid at the rate of $162.50 weekly with interest at seven per cent. Frances and Walker Thornton also gave Abner Wolfe, Inc. a second mortgage on their home and signed a personal guarantee of certain obligations. They did not invest any money. All of these arrangements between Walker Thornton and Rolland Thornton were with the approval of Abner Wolfe, Inc.

It was contemplated that some milk distributor would loan either Mr. and Mrs. Walker Thornton or Rolly's Shores Market, Inc. $10,000 which would be applied on the $40,000 note to Abner Wolfe, Inc. The Thorntons made appli-

cation for such loan. None was made, however.

After Walker Thornton purchased the corporate stock in Rolly's Shores Market, Inc. he and his wife Frances started operating the market on Mack Avenue. They both worked there full-time, usually seven days a week. Two bank accounts were opened at the First State Bank of East Detroit in the joint names of Walker and Frances Thornton. Neither account recited any corporate name or assumed name. All receipts from the market were deposited in the general account, No. 22–013–624. The other account was used for payroll, for withheld taxes and social security taxes. The store was operated under the name of Bucky's Shores Market, although no assumed name was ever filed nor was the corporate name changed from Rolly's Shores Market, Inc. Frances Thornton, who received none of the corporate stock of Rolly's Shores Market, Inc., believed herself to be one of the owners of Bucky's Shores Market. It does not appear that the Thorntons were particularly concerned with the formal, legal manner of operation of the market.

Beginning in April of 1964, at the request of Abner Wolfe, Inc., plaintiff Jack Scanlon's name was placed on the bank account, No. 22–013–624. All checks drawn on that account thereafter required Mr. Scanlon's signature. Mrs. Thornton acted as bookkeeper in the store. Mrs. Thornton testified, however, that Mr. Scanlon determined which bills would be paid. Both Mr. Thornton and Mr. Scanlon testified that all receipts were deposited in this account. Mr. Scanlon testified that it was his function to see that Abner Wolfe, Inc. was paid each week for its merchandise and that it also received each week its payment on the $40,000 note. He further testified that it was part of his job to see that the total inventory of the store was not reduced since the store inventory, together with the fixtures, was the principle security for the $40,000 note. Mr. Scanlon testified that he gave some suggestions as to the management of the store to Mr. Walker Thornton but that they were not usually followed. Mrs. Thornton testified that on at least one occasion the store hired an employee on the recommendation of Mr. Scanlon.

With respect to the payment of bills, Mrs. Thornton testified that although she actually wrote the checks, she did so in accordance with Mr. Scanlon's directions as to what should be paid. She would, she testified, each week write payroll checks on the second account, Account No. 22–013–921. She would show these checks to Mr. Scanlon, together with an adding machine tape verifying the computations. He would check these payroll items and then write a gross check for the payroll account. At first the gross checks were written for the amount of the salary checks, plus the social security and withholding taxes. During the period that this was done Mrs. Thornton at the end of the month would write a check on that payroll account to the store's accountants who would then pay the taxes and file the necessary returns. The accountant for the store was selected by Abner Wolfe, Inc.

Sometime prior to the end of the second quarter of 1964, Mr. Scanlon proposed that only the amount of the actual payroll check should be deposited in the payroll account and thereafter only that amount was so deposited. Mr. Scanlon continued to direct which bills should be paid. Social security taxes and withholding taxes were not one of them. Mr. Scanlon did not deny any of the above testimony and the Court believes Mrs. Thornton's testimony with regard to the manner in which bills were paid.

Mr. Scanlon testified that sometime shortly prior to July 25, 1964, he advised Abner Wolfe, Inc. that the operation of the store was not going to be successful. On Friday, July 25, 1964, Mr. Scanlon and another representative of Abner Wolfe, Inc. appeared at the store, demanded the keys and books, which were delivered, and thereafter Abner Wolfe, Inc. foreclosed the security agreement, sold the inventory, fixtures, et cetera.

On that July 25th date Mr. Scanlon or the other representative of Abner Wolfe, Inc. received the receipts of the previous day in the amount of approximately $1,000, according to Mrs. Thornton. In addition, Abner Wolfe, Inc. received the monies in the cash register on July 25. Abner Wolfe, Inc. operated the market that day and for a few days thereafter until the inventory and fixtures were sold. On July 25, Mr. and Mrs. Thornton received the amount of their net pay for that week on vouchers authorized by Mr. Scanlon. Presumably the withholding tax and social security tax on those salaries is included in the refund sought here.

It should be noted that prior to Rolly's Shores Market, Inc. commencing operation of the Mack Avenue store in 1960, Abner Wolfe, Inc. had also financed an earlier proprietor.

The relationship of Abner Wolfe, Inc. and the Thorntons, as well as the degree of control by Abner Wolfe, Inc. of the operation of this store go far beyond any ordinary debtor-creditor relationship. By controlling who and what could be paid, Abner Wolfe, Inc., through its employee Jack Scanlon, was to a large extent operating the store itself. Mr. Scanlon, on the peculiar facts here, was in the Court's opinion, "the person having control of the payment of * * * wages."

The control here goes well beyond that which existed in Century Indemnity Co. v. Riddell, District Director of Internal Revenue et al., 317 F.2d 681 (9 Cir. 1963). In *Century* the bonding company on a contractor's bond required that all advances to the contractor be deposited in a joint-control account and the signature of a representative of the bonding company was required on each check. The evidence in that case showed that the bonding company therefore knew that withholding taxes were not being paid. It could have, by refusing to countersign checks, perhaps, have forced the contractor to pay withholding taxes as a condition of signing further checks.

The United States Court of Appeals for the Ninth Circuit held that the bonding company did not fall within the language of 3401(d) (1) as the "person having control". However, there was no evidence in that case that the bonding company made the determinations as to who should be paid or what should be paid or that it was itself being paid substantial funds from that joint-control account.

The instant case is also distinguishable from Arthur Venneri Company v. United States, 340 F.2d 337, 169 Ct.Cl. 74 (1967), a case in which the principle contractor, when its subcontractor ran into financial difficulties, in order to get the work completed, advanced funds to the subcontractor only in the net amount of the payroll checks. In that case the principle contractor was not controlling the subcontractor's funds but only providing limited funds. In the instant case, Mr. Scanlon controlled funds actually belonging to Bucky's Shores Market or to Rolly's Shores Market, Inc. or to Frances and Walter Thornton,—funds resulting from the efforts of the employees whose withholding taxes were not paid and, more importantly, he was controlling them and diverting them from the payment of taxes to payment of the debt owed to his own employer, Abner Wolfe, Inc. Mr. Scanlon's position of control in this case and his reasons for exerting control and directing the payment of funds in the manner which he did are more analogous to the activities of a receiver or trustee. There was no judicially created receivership here but the operation was carried out as if there had been one. A trustee or receiver paying wages is treated as an employer. United States ex rel. Wilson v. Ragen, 178 F.2d 269 (7 Cir.1949). When a creditor, seeking to collect its debt, involves itself in the financial operation and control by its employee, Jack Scanlon, Walker Thornton and Frances Thornton or Rolly's Shores Market, Inc. or Bucky's Shores Market did not "have control of the payment of wages for

such services." Jack Scanlon had "control of the payment of such wages."

The Court finds that Mr. Scanlon was the employer within the meaning of Section 3401(a) (1), Internal Revenue Code; he is entitled to no refund.

For the foregoing reasons, plaintiff's claim for refund is denied, and the Court finds that he has no cause of action.