UNITED STATES of America, Plaintiff,

v.

Edward M. GILBERT et al., Defendants.

No. 64 Civ. 3558 (IBC).

United States District Court,
S. D. New York.

Sept. 20, 1979.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for plaintiff; Leona H. Sharpe, Asst. U. S. Atty., New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant Edward M. Gilbert; Peter Fleming, Jr., New York City, of counsel.

Webster & Sheffield, New York City, for defendant E. L. Bruce Co.; Edward Krumeich, Peter Heller, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

The dispute underlying this case originated in 1962, when Edward M. Gilbert ("Gilbert"), then President of E. L. Bruce Co. ("Bruce") made an unauthorized withdrawal of approximately $2 million from the coffers of Bruce, to cover his own financial transactions.[1]

Subsequently, Gilbert made a full disclosure of these withdrawals to the Board of Directors of Bruce, and on May 28, 1962 (and again on November 5, 1962), Gilbert executed Assignments to Bruce of all his real and personal property (as security for the payment of "loans and advances and/or extensions of credit"), amounting to well in excess of the approximately $2 million owed.[2]

---

1. See full discussion of the background leading up to the events of 1962, in *Gilbert v. Commissioner*, 35 TCM 451 [CCH Dec. 3, 745(M)] (1976).

2. Exhibits "A" and "B" attached to Bruce's motion for summary judgment and order to show cause. The affidavit of Bruce's attorney, Peter Heller, in support of Bruce's instant motion states that: "the only difference [between

Bruce failed to file the May 28th Assignment with the County Clerk's Office, and on June 22, 1962, the United States filed its tax liens against the assets of Edward and Rhoda Gilbert for the tax years of 1958, 1959, 1960 and 1962, alleging deficiencies of approximately $3.3 million dollars.[3]

The filing of the IRS liens prevented Bruce from realizing on the assigned assets until the issue of priority between the liens and the Assignments was adjudicated or settled. Heller Affidavit, filed November 20, 1978, p. 3.

This action was instituted in 1964 by the United States against Gilbert, Bruce and other creditors of Gilbert, pursuant to 26 U.S.C. §§ 7401 and 7403. The United States sought judgment against Gilbert for the amount of tax claimed and sought to establish that the Government's lien was prior in right to the assignment of Gilbert's assets to Bruce and to the claims of Gilbert's other creditors.[4]

In 1970, the litigation concerning priority was resolved in a series of Settlement Agreements between Gilbert, the United States and the various other creditors. Certain of the assigned assets were used to pay other creditors; and a Settlement Agreement (the "1970 Agreement") between the United States and Bruce divided up the remainder.[5]

Bruce then moved for partial summary judgment, which relief was granted on July 13, 1970. The partial summary judgment Order, entered by Judge Ryan, compelled the turnover of certain of Gilbert's assets to Bruce and others, subject only to the 1970 Agreement and the right of Gilbert to have Bruce apply the proceeds received from the 1970 Agreement and the summary judgment distribution toward Gilbert's indebtedness to Bruce.

Subsequently, the issue of Gilbert's tax liability was transferred to the Tax Court. By order dated June 24, 1975, we approved a Stipulation dismissing the Government's actions as to all parties *except* the United States and Bruce, and transferring this action to the suspense calender of this court.[6]

The Tax Court held Gilbert liable for the tax on the 1962 withdrawals, by a decision entered April 1, 1976. *Gilbert v. Commissioner*, 35 TCM 451 [CCH Dec. 33,745(M)] (1976). The Second Circuit Court of Appeals reversed and remanded, in a decision dated April 5, 1977. *Gilbert v. Commissioner of Internal Revenue*, 552 F.2d 478 (2d Cir. 1977). That court held that:

> [W]here a taxpayer withdraws funds from a corporation which he fully intends to repay and which he expects with reasonable certainty he will be able to repay, where he believes that his withdrawals will be approved by the corporation, and where he makes a prompt assignment of assets sufficient to secure the amount

---

the two assignments was] that (a) the [second] assignment specifically acknowledged the debt to Bruce in the amount of $1,953,000 plus interest and (b) real property and personal property were covered by separate instruments." Heller Affidavit, note, p. 3.

3. At present, the tax liability of Gilbert for the years 1958, 1959 and 1960 has been paid in full. As we shall see, the Second Circuit Court of Appeals recently decided that Gilbert had incurred no tax liability on the 1962 withdrawals from Bruce. See *infra*, p. 308.

4. In 1964, Gilbert pleaded guilty to federal charges of fraud and conversion; and in 1967 he pleaded guilty to State charges of grand larceny. These criminal proceedings throughout the 1960's may account for some of the delays which caused this case to appear before us 14 years after it started.

5. See Exhibit "C" attached to Bruce's current motion for summary judgment, filed November 20, 1978: Bruce-United States Settlement Agreement.

6. As recited in the Heller Affidavit, p. 6: "The trial of [the Tax] case ultimately commenced in April 1975, at approximately which time the United States submitted a proposed order by which the present action would have been dismissed as to *all* [sic] parties. Bruce opposed that order as to itself, the United States and Gilbert on the ground that after a decade of pending litigation, and in the event of a Tax Court ruling favorable to Gilbert, it would be highly impractical, inefficient and unfair to require Bruce to commence a new action for the return of excess amounts paid to the United States instead of allowing it to proceed by motion in this case."

owed, he does not realize income on the withdrawals . . . . *Id.*, p. 481.

As for the Assignments, the Court stated that: "Bruce's failure to make an appropriate filing to protect itself against the claims of third parties, such as the IRS, did not relieve Gilbert of the binding effect of the assignment." *Id.*, p. 481. The thrust of the Court's ruling was that although Gilbert had made an unlawful withdrawal, the transaction was "in the nature of a loan."

The Court of Appeals then remanded the case to the Tax Court for a determination of the amount of liability outstanding in light of the Court's opinion. The Tax Court determined that there had been an overpayment for 1962, based on the proceeds realized by the United States from the sale of Gilbert's property. On October 25, 1978, Gilbert reached a settlement with the IRS by which it was agreed that the Government was then holding $67,000 plus interest plus 700 shares of West Indies and Caribbean Ltd., all in excess of Gilbert's tax liability.

In accordance with the 1970 Agreement, the IRS gave Bruce 30 days notice of its intent to repay the excess to Gilbert, whereupon Bruce moved by order to show cause for immediate prevention of the transfer of assets to Gilbert by the Government, and for a temporary stay pending the Court's determination of Bruce's entitlement to the excess; which relief this Court granted.[7]

Bruce, claiming that Gilbert still owes $1.5 million plus interest on the original $1.95 million withdrawal, has moved for summary judgment under Rule 56, Federal Rules of Civil Procedure, for an order directing payment to Bruce of the $67,000 plus interest and the 700 shares of stock. Gilbert has cross-moved for dismissal for lack of jurisdiction, Rule 12(b)(1), F.R. Civ.P.; or alternatively, for summary judgment directing payment of the excess fund over to Gilbert.

The Government takes the position that it is obligated under the tax laws to make the refund to "the person who made the overpayment," 26 U.S.C. § 6402(a), but takes no position on the entitlements of Bruce or Gilbert, and maintains that the refund must be issued to the taxpayer; however, the Government would not oppose a protective order to guarantee Bruce's claim, should this Court decide in Bruce's favor.

The threshold issue facing this Court is whether it retains jurisdiction over the issue of entitlement as between Bruce and Gilbert, in light of the final adjudication of the Government's claim.

Once jurisdiction is found, there is the matter of the interpretation, as a matter of law, of the various Agreements and Orders which, it is claimed, settle the rights and entitlements of the parties before us.

Finally, there is the question under 26 U.S.C. § 6402, of repayment and the issuance of a protective order, if necessary.

### JURISDICTION OF THE COURT

This action was commenced in 1964 by the United States to enforce United States tax liens for the years 1958, 1959, 1960 and 1962 against Gilbert, and to establish the priority of the Government's lien over the claims of other creditors, including Bruce.

26 U.S.C. § 7403(a) (Internal Revenue Code) permits the United States to bring a civil action in the District Court to enforce its lien or "to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability."

Section 7403(b) says that: "All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto."

Section 7403(c) further provides: "The court shall . . . proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property . . . ."

---

**7.** By November 17, 1978, when the present issue was joined, the Government had already turned over the 700 shares to Gilbert, before the expiration of the 30-day notice period.

These shares were ordered to be turned over to the Court, where they are now being held. The money—$67,000 plus interest—is still being held by the United States Government.

Thus, subject-matter jurisdiction in this case derived originally from the fact that this suit was commenced by the United States, pursuant to 28 U.S.C. § 1345, and that it arose under the internal revenue laws, 26 U.S.C. § 7402(f).

Gilbert argues that all rights and interests of the United States have been fully adjudicated and that the claim of a state creditor does not warrant our attention and must be dismissed for lack of jurisdiction.

We disagree with the view that this Court lacks such jurisdiction, and conclude that the Court retains its original jurisdiction over the matter under 26 U.S.C. § 7403(c) and 28 U.S.C. § 1340; that the Court has the ancillary power to determine the cross-claim between Bruce and Gilbert, co-defendants in the original suit; we conclude also that the Court is compelled to interpret, as a matter of law, its partial summary judgment Order issued in 1970 and the 1970 Settlement Agreement approved by this Court. Finally, we hold that considerations of fairness to the litigants and of judicial economy require us to retain jurisdiction here and finally dispose of the assets within the control of the Court.

*Original Jurisdiction*

Section 7403(c) of the Internal Revenue Code provides that: "The court shall . . . proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property . . . ."

■ The IRS lien reaches all property in which the taxpayer has an interest, subject to certain exemptions, and the United States has the power of sale over property in which persons other than the taxpayer have an interest. Chommie, Federal Income Taxation § 305; *U. S. v. Mosolowitz*, 269 F.Supp. 12 (D.Conn. 1967).

As stated by the court in *U. S. v. Overman*, 424 F.2d 1142, 1146 (9th Cir. 1970):

We emphasize that section 7403 is cast in mandatory terms only in respect of the establishment of the Government's lien, the joinder of all persons interested in the property involved, and the determination

of their respective interests. The remainder of the section confers broad discretionary powers upon the court in shaping a decree designed to work substantial justice among all interested persons. "Congress [in enacting § 7403] intended that the Court function with the full traditional flexibility of the Chancellor." (citations omitted).

. . . . .

[T]he Government's right to share in the proceeds of sale does not exceed the taxpayer's interest in the property subjected to the lien.

■ Gilbert did not deny this Court's power, under 26 U.S.C. § 7403(c), to authorize the previous Settlement Agreements and to issue the partial summary judgment Order which finally determined the rights of certain parties to this action as originally filed. To say that we have no power to decide the final disposition of the very assets in contention between the parties all this time would be to leave the job half-finished and would overlook the mandate of § 7403(c) and the intent and purpose of the prior dispositions by this Court.

*Ancillary Jurisdiction*

Gilbert's argument against ancillary jurisdiction over the dispute between Gilbert and Bruce relies heavily on the case and doctrine of *Pettyjohn v. Pettyjohn*, 192 F.2d 322 (8th Cir. 1951). In *Pettyjohn*, the Eighth Circuit Court of Appeals prohibited the District Court from retaining jurisdiction over cross-claims between co-defendants, in an action brought by the United States under 26 U.S.C. § 3678, the predecessor of 26 U.S.C. § 7403. Each co-defendant claimed title to the properties against which the United States sought to impose its lien. The District Court had consolidated the cases finding that they "[involved] the same parties and in large part identical facts, claims and issues of law." *Id.*, at 324. The District Court entered a decree finally determining the rights of the United States and then proceeded to trial on the cross-claims.

The Court of Appeals held that the court below had exceeded the scope of the jurisdiction granted by § 3678(c) [§ 7403(c)], finding that there was no diversity between the remaining parties, and that the United States had made no claim to the disputed property. The Court further held: "The controversies between the cross-claimants . . . were not thereafter within the ancillary or auxiliary jurisdiction of the District Court as incidental or necessary to its jurisdiction and complete determination of the main action."

Finally, the *Pettyjohn* court noted: "While it is said that a Federal Court which has taken possession of property acquires exclusive jurisdiction of claims against the property in its possession, that jurisdiction is exclusive only so far as necessary in the final disposition of the issues before it."

We do not conceive *Pettyjohn* to be a binding precedent in this case. Rule 13(g) of the Federal Rules of Civil Procedure provides that:

> A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter . . . of the original action . . . or relating to any property that is the subject matter of the original action.

The Court of Appeals in *Pettyjohn* found Rule 13(g) to be inapplicable to its case, on the ground that the Rules of Civil Procedure could not extend the otherwise absent jurisdiction of the Federal Court. However, *Pettyjohn* has been criticized as a minority view, inconsistent with the words and intent of Rule 13(g).[8] The correct rule would seem to be that: "[A] claim is ancillary when it bears a logical relationship to the aggregate core of operative facts which constitutes the main claim over which the court has an independent basis of federal jurisdiction." *Revere Copper & Brass Inc. v. Aetna Casualty & Surety Co.*, 426 F.2d 709 (5th Cir. 1970).

■ An ancillary claim is without independent jurisdictional grounds, but is logically related, in terms of the factual and legal issues presented, to the main action. A recent statement by this Circuit in this area re-affirms our view that when federal and non-federal claims "arise out of the same transaction" the court has the ancillary power to decide them both. *Federman v. Empire Fire & Marine Insurance Co.*, 597 F.2d 798 (2d Cir. 1979).

It should be remembered that Bruce entered this action under the mandatory joinder provision of 26 U.S.C. § 7403(b). The claim of Bruce Co. to Gilbert's assets and the proceeds thereof has been inextricably intertwined, from the start, with Gilbert's alleged tax liability, with the claims of other creditors, and with the imposition of the IRS tax lien.

Only after a resolution of the issue of relative priorities with Bruce was the United States able to foreclose on its lien. The decisions of the Tax Court and the Court of Appeals here as to Gilbert's tax liability involved analyses of the withdrawal of assets and the assignment of assets between Gilbert and Bruce. The Court of Appeals decision makes reference to the binding effect of the Assignments of Gilbert's assets to Bruce; and the 1970 Agreement and partial summary judgment Order attempted to penetrate the morass of rights and claims existing between Bruce, Gilbert and the United States.

■ In *Revere Copper & Brass Inc., supra,* at 715, the Court observed:

> There is much to be said for allowing parties who are involuntarily brought into federal court to defend against a claim, or who must be allowed to inter-

**8.** Fraser, Jurisdiction of the Federal Courts of Actions Involving Multiple Claims, 76 F.R.D. 525, 530 (n.19) (1978).

"In *Pettyjohn v. Pettyjohn* (citation omitted), the court indicates that a cross-claim which relates to property that is the subject matter of the original action may have to independently meet the federal jurisdictional requirements. This appears to be inconsistent with the cases which hold that a non-diverse party may intervene to protect his property."

See also *Childress v. Cook,* 245 F.2d 798, 804 (n.10) (5th Cir. 1957), citing cases "in which jurisdiction over otherwise non-cognizable cross-claims has been upheld by virtue of Rule 13(g). . . ."

vene in a federal action as a defendant to secure their interests, to assert all their claims arising out of the controversy in one proceeding and that this is, or ought to be, one of the factors to be considered in determining the existence of ancillary jurisdiction.

See also Wright, Federal Courts § 9 (1976); *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926).[9]

Bruce's claim against Gilbert for the return of the assets, and the Government's original claim against Gilbert for tax liability in 1962, arose out of the same core of facts and the same transaction—that is, the withdrawal of approximately $2 million by Gilbert from Bruce in 1962, and the subsequent assignment by Gilbert to Bruce of all his assets.

 Where, as here, the essential facts of the claim of the United States against Gilbert and Bruce, put forward in the original action, are so closely related to the issue between Bruce and Gilbert, considerations of fairness and judicial economy compel us to retain jurisdiction over the cross-claim between these co-defendants, even if independent jurisdictional grounds are absent. *Dery v. Wyer*, 265 F.2d 804 (2d Cir. 1959).[10]

*Jurisdiction of the Court over property in its custody*

The only question before us is who is ultimately entitled to the assets now in the custody of the United States and this Court. As we view the jurisdictional issue, the dispute between the parties falls well within the jurisdiction of this Court, as discussed above.

Additionally, the Supreme Court has recognized ancillary jurisdiction where a claim "has direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit." *Fulton National Bank of Atlanta v. Hozier*, 267 U.S. 276, 280, 45 S.Ct. 261, 262, 69 L.Ed. 609 (1925), cited in *Grimes v. Chrysler Motors Corp.*, 565 F.2d 841 (2d Cir. 1977).

Specifically in tax cases, it has been held: "Where property is 'taken or detained' under any revenue law, the District Court within whose district the property is located has jurisdiction to decide claims of title and to award possession of the seized property to the rightful owner." *Bartell v. Riddell*, 202 F.Supp. 70, 74 (S.D.Cal.1962).

In *Bartell*, the plaintiff was not the taxpayer, nor was the taxpayer joined in the suit at all. The plaintiff brought suit against the United States (under a statute whereby the United States waived its sovereign immunity), and claimed title to property held by the United States, which plaintiff claimed could not be used or sold in satisfaction of the taxpayer's liability. The

---

**9.** In *Moore v. New York Cotton Exchange*, 270 U.S. at 610, 46 S.Ct. at 371, the Court was discussing the relation of non-federal counterclaims to the "transaction" constituting the basis of the federal claim, which had been dismissed on the merits. The Court retained jurisdiction over the counterclaims, despite certain factual discrepancies between those counterclaims and the main cause of action, stating: "That they are not precisely identical . . . does not matter. . . . So close is the connection between the case sought to be stated in the bill and that set up in the counterclaim, that it only needs the failure of the former to establish a foundation for the latter . . . ."

It is, of course, well established that the law relating to compulsory counterclaims, as stated in *Moore*, is equally applicable to crossclaims under Rule 13(g). *Federman v. Empire Fire & Marine Ins. Co., supra*, at 811; Wright & Miller, Federal Practice and Procedure: Civil § 1432 (1971).

**10.** Pendent jurisdiction, pressed on this court by Bruce, offers an alternative ground for jurisdiction, somewhat different from that of pure ancillary jurisdiction. The Second Circuit described the fundamental differences as follows: "A pendent claim is a [state] cause of action without independent federal jurisdictional basis, brought by a party who is also asserting a substantial federal claim. . . . *United Mine Workers v. Gibbs* (citation omitted). In contrast, ancillary jurisdiction is generally said to pertain to claims asserted after the main complaint usually by litigants other than plaintiff, such as counterclaims within the purview of Rule 13(a)." *Harris v. Steinem*, 571 F.2d 119, 122, n.7 (2d Cir. 1978). In light of this distinction, we find Bruce's cross-claim to be within the ancillary jurisdiction, not the pendent jurisdiction of this court.

court held that it had jurisdiction to determine who had title to that property.

In this case, not only is the taxpayer a party to the action, but it was the United States which commenced the action, voluntarily invoking the jurisdiction of this Court. Claims to ownership of property seized in connection with the tax laws and held in the custody of the Court are within the jurisdiction of the Court to adjudicate. The issue of entitlement to the assets involved must be finally resolved in favor of the "true" owner, to carry out, with full justice, the intent and purpose of the tax laws. This end can be accomplished only by retention of jurisdiction over the parties involved, and their claims to the property placed before this Court 15 years ago.

We have the assets in question in our custody; we issued the partial summary judgment Order and approved the Settlement Agreement which go to the very heart of the issue of entitlement as between these parties, and to which we now turn. We must, in all fairness, exercise our full jurisdictional authority to retain this case.[11]

## BRUCE'S ENTITLEMENT TO THE RETURN OF THE ASSETS

As mentioned above, the 1970 Agreement, together with the partial summary judgment Order issued by this Court, established the relative priorities of Bruce, the United States and other of Gilbert's creditors, in the assets of Gilbert. The litigation over priorities between Bruce and the United States resulted from Bruce's failure to timely file the 1962 Assignments, and the Government's subsequent filing of its tax lien. Bruce and Gilbert now contest their respective rights under these prior determinations, and thus we turn to a close examination of each one.

### The 1970 Settlement Agreement

In 1970, Bruce and the United States joined in an Agreement, in resolution of the disputed priority of their claims to Gilbert's assets, whereby they divided up the assets held by Bruce pursuant to the 1962 Assignments.

Certain assets (Schedule A) went outright to Bruce "free and clear of all liens and claims of the United States." Other assets (Schedule B) went to the United States "free and clear of all liens and claims of Bruce." Paragraphs 1(a) and 1(b).

Paragraph 1(c) provided:

*All property and rights to property other than that described in paragraphs 1(a) and 1(b) . . . which could be credited against the indebtedness of Edward M. Gilbert ("Gilbert") to Bruce by reason of assignments by Gilbert to Bruce dated May 28, 1962 and/or November 11, 1962 (the "Gilbert Assignments"), and all property and rights to property which were owned by Gilbert on or before November 11, 1962 and which could be applied by the United States toward the tax liability of Gilbert for the years 1959, 1960 and 1962, whether such property or rights to property are now or in the future reduced to possession by Bruce or by the United States, shall be considered to be the property of Bruce and the United States and/or encumbered fully by the liens or claims of Bruce (under the Gilbert Assignments) and the United States (for taxes for 1959, 1960 and 1962). Such*

11. Bruce has argued as further grounds for our retention of jurisdiction that we find diversity as the basis for the instant motion. At the time the action was originally brought, there was federal question jurisdiction, pursuant to 26 U.S.C. § 7403 and 28 U.S.C. § 1340, but not diversity. Bruce argues that in 1969, having merged with Cook Industries, Inc., a Delaware Corporation, there came to exist diversity jurisdiction, between itself and Gilbert.

On this point, however, we agree with Gilbert that the creation of diversity after commencement of an action will not fill the jurisdictional gap. Diversity jurisdiction is determined at the time the action is commenced. *Smith v. Sperling*, 354 U.S. 91, 93 n.1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3608.

No doubt, were we to dismiss this case, Bruce could assert diversity jurisdiction as grounds for a renewal of the action in Federal Court. Nonetheless, we reject it as grounds for continuing the instant case before us, which, we hold, is within the jurisdiction of the Court on the grounds discussed above.

*property and rights to property include, but are not limited to, the items listed in Schedule C.* (emphasis added)

It should be noted here that Gilbert's "interest in shares of West Indies & Caribbean Development, Ltd." was listed on Schedule C, those assets to be divided between Bruce and the United States in order to satisfy Gilbert's tax liability. Additionally, Gilbert's own Statement pursuant to Rule 9(g) states in paragraphs 11–13:

On November 2, 1978, the Tax Court entered an Order that there had been an overpayment in income tax for Gilbert's 1962 taxable year, based on proceeds realized by the United States from the sale of Gilbert's assets as follows:

$13,759.38 (February 22, 1972)

$42,916.39 (July 6, 1973)

$8,625.47 (July 13, 1973)

The foregoing amounts constituting the overpayment were funds paid to the United States as its 35 percent share of the proceeds derived from the sale of Gilbert's property.

The additional $2,497.25 listed by the Tax Court as part of the overpayment represents an income tax refund due Gilbert for the taxable year 1976.

Paragraph 3 of the Agreement provided:

With respect to the property described in paragraph 1(c) hereof, the following provisions shall apply:

(a) All property described in paragraph 1(c) hereof . . . shall be reduced to possession and sold or disposed of by Bruce, subject to the following terms and conditions:

(ii) . . .

(A) Except as provided elsewhere in this agreement, the said proceeds shall be divided as follows:

Bruce, 65%

United States, 35%.

Paragraph 6 of the Agreement, upon which Gilbert relies exclusively for his claim of entitlement to the excess assets, provides as follows:

6. *It is understood that any distribution to the United States of money, property or rights to property pursuant to this Agreement is based on the assumption that Gilbert has incurred liabilities to the United States for unpaid income tax, plus penalties and interest, for the years 1959, 1960 and 1962.* In the event that such liabilities are fixed by a court or courts (whose decision or decisions are not subject to further review or appeal), or by settlement or compromise between the United States and Gilbert, and *should the amount of money theretofore distributed to or realized by the United States* pursuant to this agreement or otherwise and applied against such liabilities *exceed the amount of such liabilities* as so fixed, *then, within 30 days after such excess has been determined and at least 30 days before any refund is made to Gilbert, the United States shall*

(A) *Notify Bruce of the existence of such excess money.*

(B) Notify Bruce of the existence of any property or rights to property still in the possession of the United States belonging to Gilbert . . .

(C) Deliver to Bruce a copy of each release of lien executed by the Internal Revenue Service against property or rights to property, wherever located, of Gilbert, in respect of taxes, penalties and interest for 1959, 1960 and 1962.

(D) Not assert on its own behalf any claims with respect to the money, property or rights to property referred to in (A) or (B) of this paragraph 6 superior to the claim of Bruce. (emphasis added)

It is absolutely clear from paragraph 1(c) of the Agreement that Bruce retained a lien on those properties transferred to the United States pursuant to paragraph 3. It is equally clear that the assets in dispute were a part of the transfer under paragraph 3, and were at all times jointly owned, as it were, by both the United States and Bruce, subject to the United States tax liens, and to Bruce's rights under the Assignments.

It is clear, as a matter of law, based on the language within the four corners of the Agreement, that the United States did not "own" the 35% share, as Gilbert contends,

but held it subject to Bruce's lien; just as Bruce held its 65% share subject to the Government's claim.

It is Bruce's position that under the Settlement Agreement, Bruce having ceded to the United States no more than was necessary to satisfy Gilbert's tax liability for 1959, 1960 and 1962, Bruce could then proceed to recover any excess assets after receiving the notice provided for in the Agreement, by motion in this case.[12]

Gilbert, on the other hand, claims that the Agreement was a final resolution of Bruce's right and entitlement, whereby the assets on Schedule B and 35% of the assets on Schedule C or elsewhere were absolutely transferred to the United States to satisfy Gilbert's tax liability.

The affidavit of Peter Fleming, on behalf of Gilbert, states in paragraph 8: "The funds now held by the United States are United States property and must be returned to the taxpayer pursuant to the mandate of the Internal Revenue Code, 26 U.S.C. § 6402. [See our discussion of this point at pp. 318–319]. The terms of the Settlement Agreement . . . and of this Court's partial summary judgment order . . . are fully consistent with this result. Any claim that Bruce may have against Gilbert on the basis of its security interest in his property would have to be asserted against Gilbert in a separate proceeding—not against the United States herein." [13]

Regardless of the explanations offered by counsel, well-argued on both sides, we find that the language of the 1970 Agreement is clear and unequivocal: Bruce retained its lien on the property transferred to the United States, under the authority of paragraphs 1(c) and 3 of the Agreement, subject only to a final determination of Gilbert's tax liability; and that in the event of the determination of an excess over Gilbert's liability, Bruce would be notified immediately.

---

12. The Heller Affidavit submitted on behalf of Bruce gave the following explanation, in paragraph 8(b):

"Bruce and the United States entered into a settlement agreement . . . pursuant to which some of the Assigned Assets were retained in their entirety by Bruce and others were retained in their entirety by the United States . . . . The remaining Assigned Assets—not transferred to other parties under [certain other settlement agreements]—were to be disposed of by Bruce, and the net proceeds of such disposition were to be divided 35% to the United States and 65% to Bruce . . . . This division, however, was subject to certain conditions set forth in paragraph 6 of the agreement. Specifically, if after adjudication or settlement of Gilbert's tax liabilities for 1959, 1960 and 1962, it was determined that the amounts received by the United States pursuant to the Bruce-U.S. Settlement or otherwise exceeded those liabilities, the United States would repay the excess. Although that repayment technically was to be made to Gilbert because the United States' taxpayer relationship was with Gilbert and not Bruce, the United States recognized that the funds or other assets constituting the excess came from the Assigned Assets, and that Bruce was entitled to the Assigned Assets. Thus, paragraph 6 also provided that no excess would be turned over until 30 days after Bruce was notified of the existence of the excess."

13. Bruce explains the language of paragraph 6 of the Agreement, providing for notice to Bruce in the event of any excess over Gilbert's tax liability being held by the Government, by means of the affidavit of Edward Krumeich, to which is attached, as Exhibit A, a letter from one of Bruce's attorneys to one of Gilbert's attorneys (dated May 18, 1977) stating the following:

"The intent of the paragraph was that the government repay to Bruce any excess which it realized either by taking over assets or by getting a portion of the proceeds of sale of other assets which is in excess of the tax liabilities of Ed and Rhoda Gilbert for 1959, 1960 and of Ed Gilbert for 1962 as finally fixed. Before the paragraph was put in final form, the government pointed out that theoretically at the time of such final fixing of Gilbert's tax liability, Gilbert may have repaid to Bruce from sources other than the assigned assets, the entire amount due. For that reason the agreement provides for notice to Bruce before any repayment to Gilbert."

As we have seen, Gilbert's tax liability (or lack thereof) for 1962 was not finally determined until the Court of Appeals rendered its decision in 1977. The 1970 Agreement, according to this view, provided, in anticipation, for notice to Bruce in order that Bruce might assert its claim to recovery of excess assets, if any, in accordance with the technical provisions of the Tax Code for refund of excess tax payments.

■ To say that Gilbert, bound by a valid and complete assignment of his assets to Bruce, could regain his assets "through the back-door" by recovering a tax refund from the Government, does not accord with this Court's sense of the equities, nor with its interpretation, as a matter of law, of the Agreement by which Bruce turned over the assets in the first place. In fact, we reiterate, it was precisely the binding effect of the Assignments which operated to relieve Gilbert from any tax liability on the withdrawal from Bruce. Gilbert cannot now be heard to dispute Bruce's entitlement under those Assignments *and* claim entitlement to a tax refund.

Were Gilbert's claim a "fairly reasonably interpretation" of the language of the 1970 Agreement, a triable issue of material fact might be presented, which would prevent this Court from granting summary judgment on this motion. "Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact . . . ." *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).

While Bruce has presented a well-argued, well-documented explanation by affidavit, for its reading of the document, Gilbert has presented no such "fairly reasonable interpretation." The 1970 Agreement cannot possibly be construed as a final resolution and absolute transfer to the United States of Bruce's interest. The Agreement expressly provides for the contingency that the amounts transferred to the United States might exceed the amount due the United States as fixed by the Courts. Should that contingency arise, as it has, the United States was to give notice of the existence of the excess to Bruce, in order that Bruce might assert the lien it had retained all along on those assets, as provided in paragraph 1(c) of the Agreement.

■ It is the normal premise of tax law that the Government is entitled only to property of the taxpayer which satisfies his tax liability. The Agreement cannot be construed to mean that the Government is entitled to any more than that, and that

through the Government's claim, Gilbert can regain those assets he completely and legally transferred away.

### The Partial Summary Judgment Order

In July 1970, Judge Ryan's partial summary judgment Order finally disposed of the claims to Gilbert's assets of all creditors, other than Bruce and the United States, who had originally been joined in this action pursuant to 26 U.S.C. § 7403(b). All of these parties had reached separate Settlement Agreements with Bruce and/or with the United States, and the Order incorporated those Agreements by reference.

The Order provided that the assets remaining after distribution to the other creditors were restricted only by: "(i) the rights of the United States and Bruce against each other as set forth in a settlement agreement between Bruce and the United States. . . . Said agreement to be binding upon and inure to the benefit solely of the United States of America and Bruce and to have no effect upon the rights or obligations of any other party hereto."

The Order further provided, as to Gilbert, for:

(ii) *the right of Gilbert to have Bruce apply the proceeds of the aforesaid settlements* and the proceeds of disposition of the property delivered to Bruce hereunder *towards Gilbert's indebtedness to Bruce* (including interest thereon) secured by the assignments executed by Gilbert to Bruce dated May 28, 1962 and November 5, 1962 . . . *and Gilbert's right to have Bruce return or pay over to Gilbert the excess, if any, of such proceeds and/or property after Bruce shall have received net proceeds equal to the amount of such indebtedness; provided that if it should be finally adjudged or determined that Gilbert is indebted to the United States for income taxes* and the United States has a tax lien on the property distributed under this order, *Bruce shall reduce the credit given to Gilbert to the extent that it has made payments to the United States under the Bruce-United States Settlement but such reduction*

*shall in no event exceed the amount so adjudged or determined to be due from Gilbert to the United States and subject to tax lien . . . .* (emphasis added)

The parties have presented no material dispute as to any issue based on this Order. The Order speaks clearly, on its face, to the respective rights of Bruce, Gilbert and the United States.

To recapitulate briefly, Gilbert owed Bruce approximately $2 million secured by the 1962 Assignments. The interposition of the IRS tax lien, which also covered Gilbert's assets, and stood in disputed relation to those Assignments, resulted in a split of proceeds between Bruce and the United States to satisfy what it was anticipated Gilbert's tax liability would be. The 1970 Agreements and the partial summary judgment Order adjudicated the claims of all other creditors, retaining only Bruce, Gilbert and the United States, as their respective rights were defined by the legal documents executed between them.

In May of 1975, this Court entered an order dismissing the instant action as against all parties other than Bruce, Gilbert and the United States. As to the remaining parties, the action was transferred to the suspense calendar of the Southern District. At that time, Bruce opposed a motion made by the Government to dismiss the action entirely. The Heller Affidavit in support of the instant motion presents an affidavit (Exhibit E) made by Thomas Field in opposition to the motion to dismiss, which offered the following comments:

The interest of all other parties other than Bruce, Gilbert and the United States has been finally settled, and it is clearly proper to dismiss the action insofar as all the remaining parties are concerned.

As to Bruce, this action involved the rights of Bruce and the United States to various assets of Edward M. Gilbert. A settlement agreement between Bruce and the United States left their future rights to various Gilbert assets, and to various moneys already collected by the United States on account of various alleged income tax liabilities of Gilbert, dependent on the outcome of the trial of the issue of Gilbert's income tax liability for 1962. That issue was originally involved in this action. . . .

It was brought to [the Court's] attention that if the Tax Court should decide that Gilbert owes no income tax for 1962 or only a certain portion thereof, Bruce would be entitled to various repayments from the United States already made pursuant to the proceedings in this Court, and also to the settlement of its rights, vis-a-vis Gilbert. Because of these considerations the Court (Hon. Irving Ben Cooper) continued the case in this Court pending the disposition of the tax issue in the Tax Court.[14]

---

**14.** It is clear from the affidavits submitted to us on behalf of Bruce, and from the supporting documents contained therein, that Bruce has taken a single, consistent view of the meaning of these documents and of its legal rights in this case, which up until quite recently had the complete accord of Gilbert and his attorneys. Bruce has sustained a heavy burden of proof on this issue, and Gilbert has in no way even attempted to dispute the validity of these documents, which speak for themselves, nor has Gilbert adequately refuted the conclusions inevitably to be drawn therefrom. See, for example, the statements made by Bruce's attorneys in 1975, quoted above, in the affidavit of Thomas Field.

See also correspondence between Bruce's attorneys and Gilbert's attorneys during 1977, wherein it appears that Bruce and Gilbert were cooperating in a common theory of defense to the Government's tax case against Gilbert, in the Tax Court and then on appeal to the Second Circuit Court of Appeals. A letter from Thomas Field (Bruce's attorney) to Robert Whorisky (Gilbert's attorney), dated May 18, 1977, offers the following:

Once the order of the Court of Appeals shall become final, we will ask the government to provide us with a complete statement of everything realized by the government on account of the taxes due for 1959, 1960 and 1962 and Bruce will be entitled to the entire excess over the amount due to the government for the year 1959 and 1960 pursuant to the settlement reached between the government and Gilbert involving those two years.

Fortunately, we have preserved the action entitled *U. S. v. Gilbert* in the Federal Court in the Southern District for the very purpose of being able to obtain payment from the government in the event that there is a deter-

It is undisputed that Bruce has received nowhere near the full amount of indebtedness owing from Gilbert—thus there is nothing on that score that can be credited to Gilbert. On the contrary, Bruce turned over substantial assets to the United States some of which (under the IRS lien) were free and clear of any further claim by Bruce; others of which were fully subject to Bruce's claim upon final determination of the extent of Gilbert's tax liability.

■ We find that the partial summary judgment Order, which incorporated the 1970 Agreement, fully detailed the respective rights of the parties. We find further that the partial summary judgment Order simply provided for the return to Gilbert of any excess after the United States and Bruce had satisfied their valid and binding liens on his assets. We recognize, however, that the Order could not circumvent the statutory requirements regulating tax refunds; thus, assuming Gilbert were technically entitled to a refund of any excess over his tax liability, provision had to be—and was—made for notice to Bruce, to enable Bruce to intervene and protect its rights.

*Statutory Refund Requirements*

26 U.S.C. § 6402(a) provides that:

In the case of any overpayment, the Secretary . . . may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of *the person who made the*

*overpayment* and shall refund any balance to such person. (emphasis added)

Bruce and Gilbert have argued to the Court their positions that they are each entitled to a refund of the excess assets as being "the person who made the overpayment." Gilbert, as the taxpayer, asserts his rights to the refund. Bruce, however, claims that since Bruce actually transferred property in satisfaction of Gilbert's liability, it is entitled, under the 1970 Agreement and Order, to refund of the excess.

A review of the applicable law reveals that neither party has advanced the proper test: it is neither the taxpayer, nor the actual transferor, *per se*, who is entitled to the refund; rather, we must look to assumption of liability to determine proper entitlement.

In *Scanlon v. U. S.*, 330 F.Supp. 269 (E.D. Mich.1971), plaintiff's employer had paid withholdings tax, and federal insurance contributions and excise taxes assessed against plaintiff. The court found that plaintiff's employer "assumes the liability for the tax and all of the evidence in the case indicates that it paid it." *Id.*, at 271. The court noted, however, that: "The mere fact that the funds came from [the employer] would not . . . bar [plaintiff] from claiming the refund if [plaintiff] had to borrow them or if in any other manner he had obligated himself for their repayment . . . ." *Id.* The Government's motion to dismiss plaintiff's claim for refund was granted.

---

mination that Gilbert did not owe the tax. The case is on suspense calendar and can be restored to the calendar at any time by simple motion. . . . The only remaining parties in this action are Bruce, the U. S. and Gilbert. Gilbert has acknowledged in the action that all proceeds of his assets and all his assets are to be turned over to Bruce.

Since Gilbert is interested in Bruce's obtaining the maximum recovery from the government, I would suggest that we work together on the ascertainment of the amounts realized by the government and the amount due to it for 1959 and 1960.

Previously, a letter from Robert Whorisky to Thomas Field, dated April 22, 1977, had stated: "It is my understanding that there was an agreement executed between the government

and the Bruce Company in 1970, providing in substance that any amounts collected by the government and applied against Mr. Gilbert's 1962 income tax liability had to be paid over to Bruce in the event that the government does not succeed in Court. . . ."

The Heller Affidavit and the Krumeich Affidavit on behalf of Bruce adhere closely to the same single theory of interpretation—that Bruce transferred the assets it received under the 1962 Assignments to the U. S. solely to satisfy Gilbert's tax liability, if any, for 1959, 1960 and 1962, which it was compelled to do since the Government lien was filed, apparently prior to perfection of the interest transferred by the Assignments: however, Bruce retained its own lien on part of those assets, as provided by the Agreement.

In *Thompson v. U. S.*, 429 F.Supp. 13 (E.D.Pa.1977), the court cited the above-quoted passages in *Scanlon*, and went on to say that:

> [Section] 6402(a) contains no requirement that a refund claimant establish ownership of the amount claimed. All that need be shown is that the person seeking the refund is the person who made the overpayment. . . . The fact that some third person may have a superior claim to the money once it is refunded to plaintiff does not alter the fact that she is the "person who made the overpayment" within the meaning of § 6402(a).

Plaintiff in *Thompson* was detained and searched by Customs Agents at an airport, and was found to be carrying a suitcase full of money, which she claimed belonged to someone else. The money was seized and applied in satisfaction of plaintiff's tax liability. Although plaintiff was found to be merely a bailee of the funds used to pay her taxes, the court held that she was entitled to refund of the excess, whoever might ultimately claim that excess from her.

It is clear that our case falls within the guidelines set by these cases. Although Bruce held Gilbert's assets pursuant to valid and binding assignments, Bruce did not assume Gilbert's tax liability, but merely acted as agent for the transfer of Gilbert's assets subject to the Government's lien. In fact, Gilbert was found to have made an overpayment on his 1962 taxes, regardless of the fact that Bruce was in possession of his assets and entitled to claim the remainder over his tax liability, if any.

We support Gilbert's position that Bruce simply transmitted Gilbert's funds, in satisfaction of Gilbert's tax liability, as it was compelled to do in light of the relative priority of the IRS tax lien. Bruce did not assume Gilbert's tax liability—in fact, the 1970 Order clearly states that Gilbert remained obligated to Bruce to the extent of payments made by Bruce to satisfy Gilbert's tax liability.

Technically, Gilbert made the overpayment, and is entitled to delivery of the refund under 26 U.S.C. § 6402(a). However, it is equally clear that Bruce, not Gilbert, is ultimately entitled to those assets, as the transfer of Gilbert's assets by Bruce to the United States did not in any way reduce Gilbert's liability to Bruce under the 1962 Assignments.

*Protective Order*

Thus, we find ourselves required to fashion a protective order to assure Bruce's claim to these assets, on behalf of which it has timely filed its motion. The United States has no objection to—and has stated it will comply with—such an order. Bruce has agreed to modify its request so as to permit Gilbert to be the payee on the United States' check refunding the overpayment, subject to a court order compelling Gilbert to turn over the assets received to Bruce.

As Bruce points out, the 1962 Assignments themselves contain a provision stating:

> The Assignor agrees upon request to implement this Assignment by executing and delivering whatever instrument(s) counsel for the Assignee may deem essential or desirable whereby to enable the Assignee to realize the rights and property hereby assigned.

Consequently, we will dispose, by appropriate order, of the assets in the custody of this court, in accordance with the principles laid out above.

*CONCLUSION*

Gilbert's only proffered defense to Bruce's claim under the Assignments is Bruce's alleged "failure to exercise due care in the handling of the indebtedness due from Gilbert, its gross waste and mismanagement of the assigned assets and the inadequacy of its accounting." Gilbert Reply Memorandum, dated February 11, 1979, p. 11.

We conclusively find, in light of the detailed accounting submitted by Bruce's attorneys to Gilbert's attorneys (by letter dated December 4, 1978, annexed as Exhibit "C" to Bruce's Reply Affidavit of January 15, 1979), that charges of waste and mismanagement are unsupported and do not

raise a material issue of fact. It is clear that Gilbert remains indebted to Bruce for far in excess of the value of the assets presently in the custody of this Court and the United States Government, and Gilbert does not deny it.[15]

The law provides that, on a motion for summary judgment, pursuant to Federal Rules of Civil Procedure, Rule 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Bruce rests on the facts in its affidavits, and supporting exhibits, on the 1970 Agreement and the partial summary judgment Order, which speak for themselves, as well as on its own interpretation of them.

Gilbert, however, offers no sworn evidence whatever to refute the position taken by Bruce, nor did Gilbert submit exhibits of any kind documenting its alleged claim of ultimate entitlement to the assets. Gilbert asserts, in the Fleming Affidavit, that under the requirements of 26 U.S.C. § 6402, the refund must be made to Gilbert, the taxpayer. This position we uphold, technically speaking. However, no compelling evidence is submitted on the issue of entitlement, and no triable issues of material fact can thus be considered to be raised.

As required by law, we have examined all the material presented to us with a determination to draw all reasonable inferences in favor of the party against whom summary judgment is sought, and we have placed a heavy burden of proof on Bruce to demonstrate the absence of material factual issues genuinely in dispute, which burden we consider Bruce to have sustained. *Hey-*

*man v. Commerce and Industry Insurance Co., supra,* at 1320; *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatre Co.,* 388 F.2d 272, 279 (2d Cir. 1967).

Thus, in sum, we find no genuine issue of material fact to have been raised; and upon review of the entire pleadings in this matter, including Exhibits incorporating the Assignments of 1962, the Bruce-United States Settlement Agreement and the partial summary judgment Order issued in 1970; and further in light of the Court of Appeals' determination of Gilbert's tax liability in the case cited above, that Bruce is entitled to judgment as a matter of law.

We find that the $67,000 plus interest plus the 700 shares of stock of West Indies & Caribbean, Ltd. represent proceeds of the assets assigned by Gilbert to Bruce, which Bruce liquidated and transferred to the United States for the sole purpose of satisfying Gilbert's tax liability, and that those assets must ultimately be returned to Bruce, as they represent an overpayment of Gilbert's tax liability, to which Bruce is entitled.

However, in light of our finding, under 26 U.S.C. § 6402(a), that Gilbert, as the person who made the overpayment, is technically entitled to delivery of the refund, we order that immediately upon receipt of the assets constituting the excess held by the United States or now in the custody of this Court, Gilbert shall take all the necessary steps to transfer those assets to Bruce, whom we find to be ultimately entitled thereto, as a matter of law, and on the face of the papers before us.

---

**15.** The Tax Court's opinion, cited by both parties in support of their positions, does refer to Bruce's poor judgment in failing to accept Gilbert's initial offer of his assets back in 1962, at which time the value of his assets substantially exceeded his debt to Bruce. Subsequent events, including the drastic diminution in value of stocks in Gilbert's companies; and Bruce's own failure to file the Assignments, which allowed the Government's lien to intervene, prevented Bruce from realizing what might have been complete satisfaction on the debt.

However, there is no finding by the Tax Court of any fraud or mismanagement by Bruce, and we see no evidence of such offered. Thus, no issue of fact is raised by Gilbert's unsubstantiated charges.